# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

RICHARD J. JONES,

|  |  |
|---|---|
| Petitioner, | : Case No. 1:14-cv-839 |
| - vs - | District Judge Sandra S. Beckwith<br>Magistrate Judge Michael R. Merz |
| WARDEN, Lebanon<br>  Correctional Institution, | |
| | : |
| Respondent. | |

# REPORT AND RECOMMENDATIONS

This habeas corpus case, brought pro se by Petitioner Richard Jones, is before the Court

for decision on the merits on the Petition (ECF No. 1), the Return of Writ and State Court Record

(ECF No. 7,8), and the Reply and Corrections to Reply (ECF No. 10,11). Petitioner's various

motions to amend the Petition have been denied by separate Decision and Order (ECF No. 27).

Petitioner's grounds for relief as pled in the original Petition are:

> **GROUND ONE:** There was insufficient evidence to support a
> conviction for aggravated murder; OH.R.C.2903.01(A). [Trial
> transcript page citations omitted.]
>
> **Supporting Facts:** By law, a required essential element of "prior
> calculation and design" MUST show a scheme planned to carry out
> the calculated decision to cause a death. NO scheme is offered to
> satisfy the element such that a reasonable trier of fact could find all
> of the elements of the offense proven beyond a reasonable doubt.
> The eavesdropped recording violates the 4th Amendment to the
> U[nited] S[tates] C[onstitution]. [Trial transcript page citations
> omitted.] None of these calls were 911.

1

**GROUND TWO:** The guilty verdict for aggravated murder was contrary to the manifest weight of the evidence.

**Supporting Facts:** The evidence at trial greatly weighed in favor of a finding that this incident was not the result of a thoughtful, calculated plan necessary to establish "prior calculation and design" but resulted from an explosive situation initiated by the decedent.

**GROUND THREE:** The trial court erred to the prejudice of Appellant and abused its discretion in declining to provide jury instructions, thus, violating his right to a jury trial; 6th amendment U[nited] S[tates] C[onstitution], and his right of confrontation.

**Supporting Facts:** The trial court errs and the appellate court is wrong in refusing to provide an instruction for the lesser included offense of murder, the inferior degree offense of voluntary manslaughter, and the affirmative defense of self-defense where Appellant produced sufficient evidence for all of these instructions.

**GROUND FOUR:** The trial court erred to the prejudice of Appellant in the admission of prejudicial hearsay evidence.

**Supporting Facts:** Where the trial court admits recorded hearsay statements, and one eavesdropped recorded statement, which statements do not meet an exception and where said statements describe alleged prior bad acts of the accused, and the accused did not have the opportunity to cross-examine the declarant of those statements, violates the accused's right of confrontation; 6th Amendment U[nited] S[tates] C[onstitution]; and search & seizure 4th Amendment U.S.C.

**GROUND FIVE:** Appellant was denied the effective assistance of counsel, violating his 6th and 14th amendments to the U[nited] S[tates] C[onstitution].

**Supporting Facts:** Trial counsel did not sustain a continuous contemporaneous objection to State's Ex. 46.

**GROUND SIX:** Prosecutorial Misconduct. [Trial transcript page citations omitted.]

**Supporting Facts:** Eliciting inadmissible evidence in defiance of a court order and incorrectly referring to the summary chart/exhibit of calls as "911 calls" when they were not. Also, misrepresenting and misstating the testimonial evidence of the coroner regarding

"stomping"/"kicking." Plus, alluding to a stroke prior to the altercation, and a couple months stay in a hospital that is outside the evidence, and never questioning the coroner about it.

**GROUND SEVEN:** (Self-Defense), Ineffective assistance of trial counsel. [Trial transcript page citations omitted.]

**Supporting Facts:** Not investigating the autopsy and witness; Not providing expert assistance. Not preparing for self-defense as was heard by the prosecutor and judge. Failure to present defense and character witnesses, and compelling Appellant to testify. Failure to provide direct evidence (police reports of 2/07, etc…). Failure to object to the use of "stomping" where the coroner testifies no stomping took place [Trial transcript page citations omitted.] Failure to effectively question witnesses. Not objecting about the recordings being listed as 911 calls when they were not. Not objecting to eavesdropping.

**GROUND EIGHT:** Abuse of the trial courts discretion.

**Supporting Facts:** Rushing the trial, and leaving an allusion of sequester during voir dire created jury confusion while deliberating. [Trial transcript page citations omitted.] Not granting mistrials asked. [Trial transcript page citations omitted.] Ruling defense witnesses as cumulative when corroboration was needed so the prosecution couldn't make Appellant out to be a liar as in. [Trial transcript page citations omitted.] Failure to allow Appellant 9 peremptory challenges.

(Petition, ECF No. 1.)

**Procedural History**

On November 23, 2011, a Butler County grand jury indicted Jones on one count of aggravated murder in connection with the death of his father, Richard Jones, Sr. After a competency and sanity evaluation, Jones withdrew his NGRI plea and proceeded to trial. A jury found him guilty and he was sentenced to twenty-five years to life imprisonment. He appealed

to the Ohio Twelfth District Court of Appeals which affirmed the conviction. *State v. Jones,*[1] 2013-Ohio-654, 2013 Ohio App. LEXIS 569 (12th Dist. Feb. 25, 2013). The Ohio Supreme Court declined to exercise jurisdiction over a subsequent appeal. *State v. Jones,* 136 Ohio St. 3d 1509 (2013). On May 23, 2013, Jones filed an Application to Reopen Direct Appeal under Ohio R. App. P. 26(B). The Twelfth District denied the Application. *State v. Jones*, Case No. CA2012-04-077 (12th Dist. Sept. 4, 2013)(unreported; copy at State Court Record, ECF No. 7-1, PageID 441, et seq.). The Ohio Supreme Court again declined to exercise jurisdiction. *State v. Jones*, 137 Ohio St. 3d 1444 (2014), and the United States Supreme Court denied a requested writ of certiorari. *Jones v. Ohio*, 134 S. Ct. 2738 (2014). Jones then filed his Petition in this Court.

# Analysis

## Ground One: Insufficient Evidence to Support a Conviction for Aggravated Murder

In his First Ground for Relief, Jones asserts there is insufficient evidence to establish beyond a reasonable doubt the prior calculation and design element of aggravated murder under Ohio law.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

---

[1] References hereinafter to *State v. Jones, supra*, are to this decision.

*Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship,* 397 U.S. 358 (1970); *Johnson v. Coyle,* 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship,* 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset,* 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007). This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard,* 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury

> deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008); *accord Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011)(en banc); *Parker v. Matthews,* 132 S. Ct. 2148, 2152 (2012). Notably, "a court may sustain a conviction based upon nothing more than circumstantial evidence." *Stewart v. Wolfenbarger*, 595 F.3d 647, 656 (6th Cir. 2010).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U. S. 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Ibid. (quoting *Renico v. Lett,* 559 U. S. ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2062, (2012)(per curiam).

Before addressing separate assignments of error on direct appeal, the Twelfth District set forth the relevant facts:

6

**[\*P2]** In May 2011, Richard Jones, Jr. moved in with his 72-year-old father, Richard Jones, Sr. (Richard), in order to help him recover from a recent stroke and surgery. Jones and his father had a tumultuous relationship, and the two frequently argued. On October 1, 2011, the two had another argument, with Richard accusing Jones of littering the yard with beer cans while "partying" with friends. The two men continued their argument at the local Rally's drive-through restaurant, where they had gone to get food. Richard told Jones that he was no longer welcome in the home they shared, or in his life. Jones got out of his father's car and began walking back toward the house he shared with this father, but ultimately went to the house of an aunt who lived nearby.

**[\*P3]** At approximately 3:00 p.m., Richard called police to report the argument, and asked an officer to come to his home. While Jones was at his aunt's house, he called his father, and learned that Richard had called police and an officer was at the house listening to Richard's complaints regarding the argument and regarding Jones.

**[\*P4]** During the phone conversation with his father, Jones asked to speak to the officer, Elizabeth Stewart. Jones asked Officer Stewart if he could come to the house in order to retrieve his personal property. Officer Stewart permitted Jones to come to the house in order to retrieve his belongings, and stayed there until he did so. After retrieving his belongings, Jones went to a bar and consumed alcohol, then later purchased beer and went to a local park where he continued to consume alcohol.

**[\*P5]** While Jones was intoxicated, he made several phone calls to Richard, and to police dispatch regarding his assertion that Richard threatened to kill him during the 3:00 phone call before Jones spoke with Officer Stewart. Unbeknownst to Jones, the phone calls were recorded, even when Jones was placed on a hold. During the hold, Jones can be heard saying, "I'm gonna kill him * * * I will kill my father because I can, the prick * * * He's a dead man * * * I'm gonna kill him * * * He needs to die * * * We'd all be better off * * *." Jones also called Richard several times directly, and threatened his life. Richard then called police dispatch, and over the course of multiple calls that night, indicated that Jones threatened his life. Richard expressed his fear that Jones was going to kill him, and asked officers to check on his house periodically throughout the night. Officer Stewart later returned to the house around 9:30 p.m. regarding the additional string of threatening phone calls between Jones and Richard; however, Jones did not appear at the house, and she left after speaking with

7

Richard.

[*P6]  Sometime after 10:30 p.m., Jones returned to the house he shared with Richard in order to retrieve a piece of mail related to his Social Security Disability benefits. Jones did not see his father's car in the drive, and later stated that he assumed that his father was not there. Jones was unable to unlock the back door, and instead, kicked it in in order to gain access to the house. Once inside, Jones discovered that Richard was in the house. At 10:39 p.m., a call was placed to 911 from inside the house. The call lasted only seconds, during which a scuffle is heard before the call ends.

[*P7]  According to Jones' rendition of the events once he kicked in the door, Richard came at him with a knife and Jones pushed him out of the way using a straight-arm push to Richard's head. Jones then went upstairs to retrieve his mail. Jones stated that once he was upstairs, he got something to drink and sat on the couch. At that point, Richard came at Jones with a knife in one hand and a fireplace poker in the other, and the two engaged in an altercation. During the altercation, Jones hit his father in the head, strangled him, stabbed him in the neck with the knife Richard supposedly wielded against Jones, and also kicked Richard in the chest/neck/head area. Jones stated that he remembers only pulling the knife from Richard's neck, and that he must have placed the bloody knife in the kitchen sink and washed his hands after killing his father.

[*P8]  Twenty-two minutes after the brief 911 call, police dispatch sent officers to Richard's home. At 11:00 p.m., Officer Andrew Kaylor arrived at Richard's house and noticed movement inside the house. Officer Kaylor knocked on the door, but did not receive an answer. Officer Kaylor's backup, Officer Shelley Meehan, saw Jones coming to the back door near the garage, and called Officer Kaylor to the back to investigate. The officers saw that Jones had blood on his chin. When the officers asked Jones whose blood was on his face, Jones told them that he "got into it" with his father and that Richard was likely dying inside the home.

[*P9]  Officers Kaylor detained Jones while Officer Meehan went inside the home. There, he found Richard dead in the living room. Officers located a shoe print on the door, saw that the door frame was splintered, and located a broken hinge on the floor, all indicating that Jones kicked in the door. Officers then noticed that the same shoe print was imprinted with blood on Richard's shirt on the upper left hand side of his chest and near his face. Jones was

arrested and given his *Miranda* rights, and gave a 90-minute confession at the police station.

[*P10] The autopsy revealed that three types of injuries led to Richard's death, blunt force trauma to the face and jaw, manual strangulation, and stab wounds to the neck. While any or all of the injuries could have caused death, the corner concluded that the most likely chain of events started with Jones striking Richard in the face, strangling him, stabbing him in the neck, and then stomping on Richard's chest/head/neck area when Richard was near death.

*State v. Jones, supra.*

Jones raised his insufficient evidence claim as his First Assignment of Error on Direct Appeal and Respondent concedes it is preserved for merit review in habeas. The Twelfth District decided that Assignment along with his Second Assignment of Error that the verdict was against the manifest weight of the evidence and decided both claims as follows:

[*P12] Assignment of Error No. 1:

[*P13] THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION FOR AGGRAVATED MURDER.

[*P14] Assignment of Error No. 2:

[*P15] THE GUILTY VERDICT FOR AGGRAVATED MURDER WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

[*P16] Jones argues in his first and second assignments of error that his conviction is against the manifest weight of the evidence and is not supported by sufficient evidence.

[*P17] Manifest weight and sufficiency of the evidence are quantitatively and qualitatively different legal concepts. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997 Ohio 52, 678 N.E.2d 541 (1997). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Wilson*, 12th Dist. No. CA2006-01-007, 2007 Ohio 2298. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, superseded on other grounds.

[*P18] While the test for sufficiency requires an appellate court to determine whether the state has met its burden of production at trial, a manifest weight challenge examines the inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other. *Wilson*, 2007 Ohio 2298.

> In determining whether a conviction is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Cummings*, 12th Dist. No. CA2006-09-224, 2007 Ohio 4970, ¶ 12.

[*P19] While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. No. CA2006-04-085, 2007 Ohio 911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *Thompkins*, 78 Ohio St.3d at 387.

[*P20] Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Wilson*, 2007 Ohio 2298 at ¶ 35, citing *State v. Lombardi*, 9th Dist. No. 22435, 2005 Ohio 4942, fn. 4.

[*P21] Jones was charged with and convicted of aggravated murder in violation of R.C. 2903.01(A), which provides, "no person shall purposely, and with prior calculation and design,

10

cause the death of another or the unlawful termination of another's pregnancy." According to R.C. 2901.22(A), "a person acts purposely when it is his specific intention to cause a certain result * * *."

 [*P22]  "There is no bright-line test to determine whether prior calculation and design are present, and 'each case must be decided on a case-by-case basis.'" *State v. Adams*, 12th Dist. No. CA2009-11-293, 2011 Ohio 536, ¶ 23 quoting *State v. Braden*, 98 Ohio St.3d 354, 2003 Ohio 1325, ¶ 61, 785 N.E.2d 439.

Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.
*Braden* at ¶ 61, quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph three of the syllabus.

[*P23]  Some factors to be considered in determining the existence of prior calculation and design include:

> (1) whether the accused and victim knew each other, and, if so, whether their relationship was strained, (2) whether the accused gave thought or preparation to choosing a murder weapon or murder site, and (3) whether the act was drawn out as opposed to being an almost instantaneous eruption of events. A finding that these circumstances existed supports the conclusion that the crimes were committed with prior calculation and design.

*Braden* at ¶ 62, citing *State v. Taylor*, 78 Ohio St.3d 15, 19, 1997 Ohio 243, 676 N.E.2d 82 (1997).

 [*P24]  During trial, the jury heard evidence that Jones killed his father with prior calculation and design. The state presented evidence that reveals the presence of sufficient time and opportunity for the planning of the murder. The state introduced recorded telephone calls from Jones and Richard which demonstrated that hours before the homicide, Jones was already planning on killing his father. The recorded phone calls indicated that Jones, himself, stated, "I'm gonna kill him," "I will kill my father because I can, the prick," and "He's a dead man." Jones can also be heard stating that Richard was "a dead man" and that "he needs to die. We'd all be better off * * *." Richard's phone calls to

police also indicate that Jones called Richard multiple times in order to threaten his life, and to express Jones' intention to kill Richard. The threats were so real to Richard that he asked police to check on his house during the night, in fear for his life. These statements made hours before the incident indicate that Jones was planning his father's death hours before the murder actually occurred.

 **[*P25]**  The jury also heard evidence that the circumstances surrounding the homicide show a scheme designed to implement Jones' calculated decision to kill Richard. The state presented evidence that Jones kicked in the door to Richard's house and entered the home. Once inside, he straight-armed and pushed Richard, and then engaged in several actions that led to Richard's death. The coroner testified that Richard died from a combination of injuries including blunt force trauma, manual strangulation, and stab wounds to the neck. The jury heard evidence that Jones struck Richard in the head and that he then began strangling his father. Jones then stabbed Richard in the neck twice, and then kicked Richard's chest/neck/face area with this foot. [FN1 Richard's jaw was fractured, and the jaw bone penetrated into the oral cavity and through the skin so that his jaw bone was sticking into his mouth. The corner concluded that there was "considerable force applied to his jaw," and indicated that it was possible the force was consistent with being "stomped" on.]

 **[*P26]**  The coroner also testified that Richard was still alive for "a while" after the initial attack began, as evidenced by the presence of blood in his heart and fluid in his lungs. The coroner indicated that the likely chain of events started with Jones striking Richard on the face, then strangling him. When Richard was near death, but still alive, Jones stabbed him and kicked him in the chest and face area.

 **[*P27]**  The distinct actions that led to Richard's death required separate thought processes on Jones' part to first violently hit Richard in the head, *then* strangle him, *then* stab him, *then* stomp on his chest, neck and face. In between each action, Jones took additional time to contemplate his next move and decide upon the next deadly action in order to carry out his calculated plan to kill his father. Simply stated, this was not a "spur-of-the-moment accidental" death. *See State v. Goodwin*, 84 Ohio St.3d 331, 344, 1999 Ohio 356, 703 N.E.2d 1251 (1999) (finding prior calculation and design because the murder was not a "spur-of-the-moment accidental" death where a robber pointed his gun at a store cashier

and then decided to pull the trigger once the cashier's hands were above his head).

[*P28] Moreover, we find that the factors listed by the Ohio Supreme Court in Braden as being indicative of prior calculation and design are also met. First, Jones and Richard obviously knew each other, and their relationship was heavily strained. Jones presented evidence at trial that Richard was an abusive father who had a history of violence toward family members. The jury also heard evidence that Richard continually berated Jones for Jones' alcohol consumption, especially on the day of the murder. The record also contains a plethora of evidence that Jones carried an on-going and deep-seeded anger toward his father, and that Richard demonstrated equal contempt for his son. [FN2 The record contains evidence that Richard made several death threats to Jones in the past, and on at least one occasion, ran over Jones with his car.]

[*P29] Secondly, the record indicates that Jones gave thought and preparation to choosing a murder weapon and murder site. The jury heard evidence that Jones waited until nearly 11:00 p.m. to force entry in the house. He then hit his father, manually strangled his father, and then used a knife to stab Richard in the neck.

[*P30] Lastly and as previously discussed, the murder was drawn out as opposed to being an almost instantaneous eruption of events. The coroner testified that Richard's death was not instantaneous, and was instead, drawn out over a period of time, and based upon a chain of events that included strangulation, stab wounds, and stomping.

[*P31] It is readily apparent from these facts that sufficient time, reflection, and acts were involved to establish that Jones purposely and with prior calculation and design, caused the death of his father. Having found that Jones' conviction for aggravated murder is supported by sufficient evidence and is not against the manifest weight of the evidence, his first and second assignments of error are overruled.

*State v. Jones, supra*.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the

13

United States Supreme Court.  28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).

In his lengthy argument about why there is insufficient evidence (Reply, ECF No. 10, PageID 1194-1208), Jones never denies he killed his father, although he makes some argument that his father could have died of a subarchnoidal hemorrhage after he was hit, kicked, strangled, and stabbed.   He does not deny the strangulation and stabbing, although he cavils at the word "stomping," but the evidence established that the victim was kicked hard enough in the jaw to fracture the mandible and drive the bone into the oral cavity. As in many murder situations, there is only one living eyewitness who has every interest in telling the tale to suit his situation.  Nor does Jones deny that in recorded telephone conversations earlier in the day, he had said he was going to kill his father.  The evidence is manifestly sufficient to show prior calculation and design.  The First Ground for Relief should be dismissed with prejudice.


**Ground Two:  Conviction Against the Manifest Weight of the Evidence**


In his Second Ground for Relief, Jones argues his conviction is against the manifest weight of the evidence.  Federal habeas corpus is available only to correct federal constitutional violations.  28 U.S.C. § 2254(a); *Wilson v. Corcoran,* 562 U.S. 1 (2010); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982); *Barclay v. Florida,* 463 U.S. 939 (1983).   A weight of the evidence claim is not a federal constitutional claim.   *Johnson v. Havener*, 534 F.2d 1232 (6th Cir. 1986).

**Ground Three:  Failure to Provide Jury Instructions**

As noted by Respondent, not giving an instruction on a lesser included offense in a non-capital case does not present a constitutional issue. *McMullan v. Booker,* 761 F.3d 662, 672 (6th Cir. 2014); *Bagby v. Sowders,* 894 F.2d 792, 797 (6th Cir. 1990) (*en banc*); *accord, Scott v. Elo,* 302 F.3d 598, 606 (6th Cir. 2002).

Ground Three should therefore be dismissed.

**Ground Four:  Improper Admission of Hearsay**

In his Fourth Ground for Relief, Jones complains that the trial court erred in admitting prejudicial hearsay evidence.  Jones argued this claim on direct appeal as a hearsay assignment of error and the Twelfth District decided it on that basis.  *State v. Jones, supra*, ¶¶ 51-64. Whether or not evidence qualifies for admission under exceptions to the hearsay rule is purely a question of state evidence law, not federal constitutional law.

As part of this Ground for Relief, Jones argues that the trial court's admission of this evidence deprived him of his constitutional right to confront the witnesses against him.  The Twelfth District ruled on this claim as follows:

> **[\*P65]** Jones also argues that his Sixth Amendment right to confront the witnesses against him was violated because the trial court admitted the recordings without his being able to cross-examine Richard. During trial, and over Jones' vigorous objections, the trial court admitted several of the phone calls, but also found a few tracks inadmissible based on their testimonial nature. We find no abuse of discretion in the trial court's decision to admit the phone calls as it did.

> **[\*P66]** The Sixth Amendment to the United States Constitution

15

preserves the right of a criminal defendant "to be confronted with the witnesses against him." Therefore, the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L. Ed. 2d 177 (2004). "The key issue is what constitutes a testimonial statement: 'It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.'" *State v. Hood*, Slip Opinion No. 135 Ohio St. 3d 137, 2012 Ohio 6208, ¶ 33, 984 N.E.2d 1057, quoting *Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L. Ed. 2d 224 (2006).

 [**P67**] The United States Supreme Court has not defined what constitutes a "testimonial" statement, but it has given examples of "formulations" for testimonial statements such as:

> all ex parte in-court testimony or its functional equivalent; extrajudicial statements contained in formalized testimonial materials (*e.g.*, affidavits, depositions, prior testimony, confessions); and a class of statements that are made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

 [**P68**] *State v. Muttart*, 116 Ohio St.3d 5, 2007 Ohio 5267, ¶ 60, 875 N.E.2d 944, citing *Crawford* at 51-52. In determining whether statements implicate Confrontation Clause analysis, courts are to view them objectively and should focus on the expectation of the declarant at the time of making the statement. *State v. Stahl*, 111 Ohio St.3d 186, 2006 Ohio 5482, ¶ 22, 855 N.E.2d 834. "When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Michigan v. Bryant*,    U.S.   , 131 S.Ct. 1143, 1162, 179 L. Ed. 2d 93 (2011).

 [**P69**] After reviewing the record, we find that Richard's statements during his phone calls to police were not testimonial in nature. The statements were not made in the context of in-court testimony or its equivalent. There is no suggestion that they were elicited as part of a police investigation, offered in a sworn statement with intention of preserving the statement for trial, or

they were a pretext or façade for state action as is discussed by the court in *Muttart*, 116 Ohio St. 3d 5, 2007 Ohio 5267 at ¶ 61, 875 N.E.2d 944. Instead, Richard made the phone calls to elicit police assistance to meet an ongoing emergency.

 [**P70**]  The United States Supreme Court has held that, "statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). In so holding, the court reasoned that a call to police reporting an emergency situation "is ordinarily not designed primarily to 'establish or prove' some past fact, but to describe current circumstances requiring police assistance. * * * No 'witness' goes into court to proclaim an emergency and seek help." *Id.* at 827-828.

 [**P71**]  The Court further explained this reasoning in *Michigan v. Bryant*, 131 S.Ct. at 1157:

> As our recent Confrontation Clause cases have explained, the existence of an "ongoing emergency" at the time of an encounter between an individual and the police is among the most important circumstances informing the "primary purpose" of an interrogation. The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." Rather, it focuses them on "end[ing] a threatening situation." Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.

> This logic is not unlike that justifying the excited utterance exception in hearsay law. Statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," are considered reliable because the declarant, in the excitement, presumably cannot form a falsehood. * * * An ongoing emergency has a similar effect of focusing an individual's attention on responding to the emergency.

17

(Internal citations and footnote omitted.)

 [*P72]  The record is clear that Richard made his phone calls in an effort to secure police assistance because of his bona fide belief that Jones was going to kill him. While Jones argues that the calls were not seeking emergency assistance because there was not an emergency in progress and there was no immediate threat, we disagree. Each time Richard called police, it was either immediately after or, sometimes during, the time that Jones was threatening his life.

 [*P73]  During the first call, Richard stated his desire to have police come to his house because of the argument that had occurred at Rally's, and because of his fear of Jones. Richard specifically asked that Jones not be arrested because he feared that Jones would come to his house during the middle of the night and vandalize his car. Richard also stated that Jones, "right now he's walking this way," and that "he's on his way walking toward my house." During the second call, Richard stated that he was calling again "because my son is threatening to kill me" and that "my son's been calling me up threatening me * * * what should I do about that?" The third call was deemed not admissible. The fourth call was made after Jones called and threatened Richard's life again. Richard asked police to drive by his house during the night, and also stated that he was "scared to go to sleep" because of Jones statement that he "may not wake up," which Richard told police he believed was a threat on his life. Richard specifically stated that he called police because of his fear and that "I don't know what else to do." In the fifth call, Richard tells dispatch that Jones "just called" and told Richard that he was a "dead man." Richard then described Jones to dispatch and stated that Jones was "on foot" walking around, so that police could be looking for Jones and stop him before he harmed Richard. Richard also stated, "he's keeping me from going to sleep" because of the threats and his fear that he would not live through the night. In the sixth call, Richard told police dispatch that Jones had called again, and "I think I can tell you where he might be at," indicating where Jones was known to stay. The seventh, and final call, contained no words, only sounds of the scuffle.

 [*P74]  In each of the first six calls, Richard is asking the police for help and protection and providing them with information regarding Jones' threats so that police could respond accordingly. Richard was not trying to prove past events potentially relevant to a later criminal prosecution of Jones, but was focusing his

18

statements on ending the threatening situation of Jones' death threats. In fact, Richard specifically asked police not to arrest Jones because he feared Jones' retribution. Therefore, it is abundantly clear that Richard was not anticipating that his statement would be used to support any future criminal prosecution of Jones, but rather was seeking police help to ensure his safety throughout the night.

[*P75] As previously mentioned, the trial court listened to the phone calls and determined that the admissible calls were non-testimonial in nature, whereas the portions of the calls that relayed details not necessary to help with the ongoing emergency were testimonial in nature and therefore inadmissible. The trial court's analysis was well-reasoned and comports with the precedent set forth by the United States and Ohio Supreme Courts regarding proper Confrontation Clause jurisprudence.

*State v. Jones, supra.*

This decision is neither contrary to nor an objectively unreasonable application of the relevant Supreme Court precedent, particularly *Michigan v. Bryant, supra.*  As such it is entitled to deference by this Court.

**Ground Five:  Ineffective Assistance of Trial Counsel**

In his Fifth Ground for Relief, Jones claims he received ineffective assistance of trial counsel when his attorney did not "sustain a continuous contemporaneous objection to State's Ex. 46."  The court of appeals concluded on Jones' Assignment of Error Five that his trial attorney had sufficiently objected to preserve the hearsay issue for appeal.  *State v. Jones*, *supra*, ¶ 56.  Because Jones suffered no prejudice from any perceived failure of his trial attorney in this regard, he cannot established ineffective assistance of trial counsel. *Strickland v. Washington,* 466 U. S. 668 (1984).

**Ground Six:  Prosecutorial Misconduct**

In his Sixth Ground for Relief, Jones claims the prosecutor at trial engaged in numerous instances of misconduct.

Respondent asserts this claim is procedurally defaulted because it was only raised for the first time as part of Jones' 26(B) Application.  Jones does not offer any dispute of that claim in his Reply.

It is well established that a 26(B) Application to reopen a direct appeal serves only to raise claims of ineffective assistance of appellate counsel and does not preserve underlying claims for decision on the merits.  *Davie v. Mitchell,* 547 F.3d 297 (6th Cir. 2008)(Rogers, J.), and *Garner v.  Mitchell,* 502 F.3d 394 (6th Cir.  2007)(Moore, J.), both citing *White v. Mitchell,* 431 F.3d 517, 526 (6th Cir. 2005); *Moore v. Mitchell,* 531 F. Supp. 2d 845, 862 (S.D. Ohio 2008)(Dlott, J.); see also *Bailey v.  Nagle,* 172 F.3d 1299, 1309 n.  8 (11th Cir.  1999); and *Levasseur v. Pepe*, 70 F.3d 187, 191-92 (1st Cir.  1995).

Because Jones failed to raise this prosecutorial misconduct claim on direct appeal, it is barred by that procedural default.

**Ground Seven:  Ineffective Assistance of Trial Counsel**

In his Seventh Ground for Relief, Jones asserts his trial attorney was ineffective in a number of different ways.  Jones first presented these claims as part of his 26(B) Application. On that basis, Respondent asserts they are procedurally defaulted in the same way as the Sixth Ground for Relief (Return, ECF No. 8, PageID 1147-49).  Jones makes no response in his Reply

and Respondent's position is well taken for the same reason as Ground Six.

**Ground Eight:  Abuse of Trial Court Discretion**

As with Grounds Six and Seven, this Ground for Relief is procedurally defaulted because it was never presented prior to the 26(B) Application.  Furthermore, a claim of abuse of trial court discretion does not state a claim cognizable under the federal Constitution.  *Sinistaj v. Burt,* 66 F.3d 804 (6th Cir. 1995).

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

December 18, 2015.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).